Leo SASSO et al.

v.

John KOEHLER.

Civ. No. Y–77–1060.

United States District Court, D. Maryland.

June 12, 1978.

Jeffrey M. Axelson, College Park, Md., Robert F. Wood, Rochester, N.Y., for plaintiffs.

H. Thomas Howell, Baltimore, Md., for defendant.

JOSEPH H. YOUNG, District Judge.

Plaintiffs, Leo Sasso and Daniel Jordan, are the former sole owners of Milcom Products, Inc. (hereinafter Milcom), which was sold to Transitron Electronic Corporation (hereinafter Transitron), pursuant to an Agreement and Plan of Reorganization, dated February 6, 1968. Defendant John Koehler, a former director of Transitron, is an attorney who represented Transitron, as successor to Milcom, in two Renegotiation cases under the Renegotiation Act of 1951,

as amended, before the Renegotiation Board and the Court of Claims. This representation began in 1968 and ended April 24, 1974, when final settlement was approved and judgment entered.

The issue presently before the Court is whether claims alleging wrongful conduct in renegotiation matters are timely filed. In an earlier Memorandum and Order, filed January 24, 1978, all other claims against defendant were dismissed, as barred by limitations. Pursuant to that Order, the affidavit of plaintiff Jordan has been filed for the purpose of showing the timeliness of the remaining claims. For the reasons to be stated herein, these claims are also barred by the statute of limitations.

■ The timeliness of suit will be determined according to Maryland law, which requires civil actions to be filed within three years from the date they accrue, Md. Code Ann. Courts and Judicial Proceedings Article § 5–101.[1] A claim accrues when the wrong is committed, not when it is discovered. *Atwell v. Retail Credit Co.*, 431 F.2d 1008 (4th Cir. 1970); *Watson v. Dorsey*, 265 Md. 509, 290 A.2d 530 (1972).

Since the present action was commenced on July 1, 1977 and defendant completed his representation of plaintiffs in renegotiation affairs no later than April 24, 1974, it is not timely unless the limitations period is extended under the facts and circumstances of this case. It has already been determined that the filing of a prior action in the Western District of New York, which was dismissed as to defendant, is not such a circumstance.

A defendant's fraudulent conduct may extend limitations. Under Md. Code Ann. Courts and Judicial Proceedings § 5–203:[2]

If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

The beginning date for limitations is postponed by § 5–203 only if plaintiffs can show:

(i) that they were kept in ignorance by the fraud of an adverse party that they had a cause of action; (ii) how, if fraud existed, they discovered it; (iii) why they did not discover it sooner; and (iv) what diligence they exercised to discover it.

*Leonhart v. Atkinson*, 265 Md. 219, 227, 289 A.2d 1, 6 (1972).

■ The applicability of the statute is not conditioned upon a showing that the defendant committed a fraud distinct from the original fraud for the purpose of keeping plaintiff unaware of a cause of action, *Piper v. Jenkins*, 207 Md. 308, 113 A.2d 919 (1955). However, a party must exercise ordinary diligence "for the *discovery* and protection of his rights." *Id.* at 318, 113 A.2d at 924, emphasis supplied. *See also Mettee v. Boone*, 251 Md. 332, 339, 247 A.2d 390 (1968).

In the latter case, plaintiff argued that as an "ordinary layman" he was unable to learn of the defendant contractor's use of inferior tubing in the construction of a house within the limitations period. The evidence showed that plaintiff was familiar with the contract specifications and was free to inspect the house during construction. Under such circumstances, the court held that he was in a position to inquire what kind of pipe was being installed, and that ordinary diligence required him to do so.

In *Insurance Co. of North America v. Parr*, 44 F.2d 573 (4th Cir. 1930), which is quoted in both *Piper v. Jenkins, supra,* and *Mettee v. Boone, supra,* the court stated:

. . . we think it perfectly clear that it (the statute) enjoins upon a party invoking its terms a showing of diligence, and if in the exercise of diligence, the fraud of the adverse party might have

---

1. For fuller discussion of reasons for application of Maryland law, see Memorandum and Order of January 24.

2. § 5–203 was formerly Article 57, Sec. 14 Md. Code Ann., and is referred to in this way in the case law.

been discovered, the failure to exercise it is fatal to the right after the period of limitations has run.

44 F.2d at 576. In that case, plaintiffs, insurance agents in Baltimore, complained that defendant insurance company had violated a contractual obligation to pay them a higher rate of commission, once it adopted the higher rate in another city. Although this wrong had occurred more than three years prior to suit, plaintiffs claimed that they were kept in ignorance of their cause of action because defendant did not notify them that a higher rate had been established elsewhere. The court distinguished the cases where detection of the fraud cannot be expected. For example, in *Anderson v. Watson*, 141 Md. 217, 232–33, 118 A. 569 (1922), coal mine employees were underpaid because the employer used false weights to measure the coal. The employer had exclusive control of the scales and the only permanent records. When the company posted false weights, the miners had no basis to suspect wrongdoing.

However, in the case of the insurance agents, the court replied to plaintiffs' argument that defendant had a duty to notify them of certain circumstances, stating:

. . . there was at least just as much obligation on the plaintiff to make inquiry to determine whether or not that which they supposed would be done had been done, as it was the obligation of the company to advise plaintiffs it had not been done, and this, it seems to us, is the least that may be said as to the effect of the language of the statute.

44 F.2d at 577.

■ In brief, the case law indicates that the question of diligence must be decided on the facts of each case. In analyzing the facts, the key questions are whether the plaintiff could have tried to get information, or had enough information to be alerted to a possible need to look further. Once a plaintiff has a basis to look further, failure to do so is failure to exercise the requisite standard of care. The tolling effect of fraud ceases once a plaintiff is alerted to the need for possible protection.

■ Applying these criteria to the facts of the instant case, plaintiff Jordan's affidavit and the exhibits submitted with it establish a lack of due diligence.

Plaintiffs contend that they first became aware that Koehler "completely mishandled" the Renegotiation for Milcom through discovery in the New York action in 1976. Assuming arguendo, that plaintiffs first received some information not previously known to them, this is not a showing that the existence of a situation needing further inquiry first became apparent in 1976. On the contrary, the fact that plaintiffs filed a lawsuit in 1972 alleging that defendant had acted wrongfully in other transactions is strong evidence that plaintiffs were on notice of the need to examine defendant's actions further. Although that suit apparently did not charge misconduct in Renegotiation, the issues are sufficiently related to put a reasonable person on notice to investigate related transactions.

Further, the 1974 judgment, assessing liability against plaintiffs under the Renegotiation Act for excess profits, is a legal harm. If plaintiffs believed that proper representation would have produced a more favorable result, the need for action was apparent at that point. Only very unusual circumstances would justify further tolling the statute of limitations. Plaintiffs have not shown such circumstances.

The overwhelming weight of the evidence is that plaintiffs knew Koehler was representing them, and had considerable contact with him. In the Jordan affidavit, it is apparently contended that plaintiffs did not choose the attorney, as it was their right to do under the agreement with Transitron. Certainly plaintiffs knew whether their approval had been sought, without having to discover it in 1976. It is inherently illogical to suggest that plaintiffs were unaware that they had not exercised their right to choose the attorney.

The exhibits submitted with the Jordan affidavit also show that plaintiffs were in a position to act sooner to protect their interests. In view of the fact that some letters

are to or from one of the plaintiffs, or bear notations that copies were sent to them, it is simply not credible that they had no knowledge of the letters until 1976.

In a letter dated July 15, 1968, Jordan indicates that he is turning over to Koehler much "pertinent data for 1967." The letter shows that Jordan was accepting Koehler's representation and that Jordan was aware of a good deal of the information needed for the Renegotiation. This shows that Jordan had a basis to notice occurrences in the renegotiation process which did not comport with his understanding of the information.

Other exhibits include: a letter from Transitron to Jordan, dated April 17, 1968, advising him of an extension given by the Renegotiation Board (exhibit D); a letter to Jordan's attention at Milcom from the Renegotiation Board, dated June 20, 1968 advising him that expected information had not been submitted (exhibit H); correspondence concerning Renegotiation, bearing the notation that carbon copies were sent to Jordan (exhibits M and N).

Exhibit O, a letter apparently drafted by Jordan's attorneys, expresses concern with lack of adequate representation to Milcom interests, including inadequate consultation with plaintiffs. The letter indicates that copies were sent to Sasso and Jordan. This letter, alone, makes it unreasonable to believe that plaintiffs were unaware of the need to protect their interests vis-a-vis Koehler in Renegotiation until 1976.

In paragraph 13 of his affidavit, Jordan states that a 1971 inquiry to Koehler about renegotiation was met with the response, "Let sleeping dogs lie; it'll takes a hell of a long time before they get to this one." Whatever this may indicate on the merits, it shows that plaintiffs had a basis for further inquiry.

As indicated above, the point of the due diligence requirement is, that even in the presence of fraud, a party cannot abdicate all responsibility for protecting his rights. Here it is clear that plaintiffs' failure to act sooner is not attributable to the impossibility of doing so. Unlike the plaintiffs in *Anderson v. Watson, supra,* plaintiffs were

not in a situation which totally obscured the fact that harm might be occurring.

Plaintiffs knew that Koehler was acting as attorney in Renegotiation, had information about the subject matter at issue, had in fact expressed concerns to attorneys, and, by 1974, were aware that they were liable for excess profits. Under such circumstances, the due diligence requirement is not met, and the running of limitations cannot be defeated by application of § 5–203.

■ In cases of professional malpractice, the limitations period can be extended by application of the "discovery rule," whereby "the cause of action accrues when the wrong is discovered or when with due diligence it should have been discovered." *Leonhart v. Atkinson, supra,* 265 Md. at 224, 289 A.2d at 4. The discovery rule is applicable to suits against attorneys. *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 255 A.2d 359 (1969). Unlike § 5–203, the discovery rule may be invoked without a showing of fraud. However, like the statutory fraud provision, the tolling effect stops when parties "knew or *should have known*" of the alleged wrong. *Watson v. Dorsey,* 265 Md. 509, 513, 290 A.2d 530 (1972), emphasis supplied.

*Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917), the seminal case for the discovery rule in Maryland, was a medical malpractice claim, involving prescription of a drug which produced a dermatological disease. The evidence showed that: the drug was prescribed between 1904 and 1910; the first skin discoloration occurred in 1908; and serious injury was apparent only in 1913. The court held that the statute of limitations did not begin to run with the first prescription, but only in 1908 when injury was indicated. However, the court rejected the later time of serious injury as the time of accrual of the action, stating:

The discoloration of her skin, of which she complained to her husband in 1908 was a *sufficient indication* of an injury, to have put her upon *notice and inquiry,* and it is clear from the evidence that if

she had exercised ordinary care and diligence to have ascertained her rights, she *could* have discovered the cause of her alleged injury.

*Id.* at 186, 100 A. at 86, emphasis added.

The time when the first trivial injuries are noticed has been used as the starting point for limitations in the professional malpractice cases generally, and is not limited to the medical setting. *E. g., Mattingly v. Hopkins*, 254 Md. 88, 95, 253 A.2d 904 (1969); *Southern Maryland Oil Co. v. Texas Co.*, 203 F.Supp. 449 (D.Md.1962).

In suits against accountants for negligence causing tax liability, the statute of limitations is not tolled after the taxpayer receives notice of the tax deficiency. At that point, if not before, plaintiff is regarded as on notice that there has been legal harm, even if there is some uncertainty as to its extent. *Leonhart v. Atkinson, supra,* 265 Md. at 226, 289 A.2d 1; *Feldman v. Granger*, 255 Md. 288, 296, 257 A.2d 421 (1969). These cases are closely analogous to the instant case where plaintiffs became aware of liability for excess profits when a judgment was entered against them. After this point, "mere doubt" as to the precise nature of the right or the ability to assert it successfully did not excuse their inaction. *See Weaver v. Leiman*, 52 Md. 708, 718 (1880).

For all of the reasons stated in discussing the statutory fraud provision, plaintiff cannot invoke the discovery rule to toll limitations after April, 1974, and this suit is not timely filed.

Accordingly, it is this 12th day of June, 1978, by the United States District Court for the District of Maryland, ORDERED:

That all claims of plaintiffs against John Koehler be, and the same are, hereby DISMISSED, with prejudice.