700 P.2d 840

**Fred RHOADS and Mattie Rhoads, husband and wife, Plaintiffs/Appellees,**

v.

**HARVEY PUBLICATIONS, INC., Sad Sack, Inc., Alfred Harvey and Leon Harvey, et al., Defendants/Appellants.**

No. 2 CA–CIV 5048.

Court of Appeals of Arizona, Division 2.

Oct. 4, 1984.

Review Denied May 21, 1985.

Zlaket and Zlaket by Thomas A. Zlaket and Lovallo & Stirton by Joseph Lovallo, Tucson, for plaintiffs/appellees.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by John F. Molloy, Tucson, for defendants/appellants.

## OPINION

BIRDSALL, Chief Judge.

This case is before us for the third time. In *Rhoads v. Harvey Publications, Inc.*, 124 Ariz. 406, 604 P.2d 670 (App.1979) (Rhoads I), we reversed the trial court's dismissal of the complaint. The trial court had erroneously found a lack of personal jurisdiction over the defendants. In *Rhoads v. Harvey Publications, Inc.*, 131 Ariz. 267, 640 P.2d 198 (App.1981) (Rhoads II), we reversed the trial court's summary judgment entered against the plaintiffs. We must now decide an appeal following a jury verdict in favor of the plaintiffs-appellees, Fred and Mattie Rhoads, and against the defendants-appellants, Harvey Publications, Inc., et al. The verdict and the judgment entered thereon awarded compensatory damages of $1,081,109 and punitive damages of $1,500,000.

The facts viewed in the light most favorable to the appellees are summarized as follows.

In 1954 Fred Rhoads agreed to do work for Harvey as a self-employed cartoonist. He was one of several free-lance artists engaged by Harvey. He was to be paid, and was paid, $35 a page for his completed work. He continued to do the work ordered by Harvey until mid-1977, at which time Harvey discontinued sending him orders. During this time he also produced some cartoons for other companies and did one book on his own.

Prior to his contract with Harvey, Rhoads had served in the U.S. Marine Corps from 1942 to 1946. There he was assigned as a cartoonist for "Leatherneck," the official magazine of the Marine Corps. In 1947 he was employed by Jimmie Hatlow to draw cartoons for the comic strip "They'll Do It Everytime." In 1948 he was employed by Ray Gotto on the comic strip "Ozark Ike." Subsequently, he was an employee of Fred Laswell, who created the cartoon character "Snuffy Smith." He worked for Laswell for three years. His next employer was Mort Walker, who created "Beetle Bailey." He worked for Walker one year and was offered "10% of everything he is going to have in his two strips" if he stayed on. However, he left Walker and contacted Harvey in 1954. At least with Hatlow and Laswell he was paid a weekly salary from which Social Security and income tax were withheld.

With Harvey he was assigned to work on the comic strip "Sad Sack" which was copyrighted by George Baker. Although he was not the only artist Harvey used for "Sad Sack," Rhoads was assigned almost all of that work and it was his principal work for Harvey. He developed the story lines, gags, and dialogue. He created some and drew all of the characters including the inking, lettering, and erasing. During his more than 23 years with Harvey, he completed 9,500 pages of comic books. He created, following directions from Harvey, approximately 70 characters and produced approximately 13 different titles of comic books.

The appellants copyrighted, published, sold, and have retained all of the work produced for them by Rhoads. Rhoads never attempted to copyright or otherwise retain any interest in his artwork. The subject of copyrights and/or the ownership of the artwork was never discussed between the parties.

Although Rhoads was clearly an independent contractor working pursuant to an oral contract with Harvey, he testified that he thought he was an employee. He further testified that because he thought he was an employee, he believed that Harvey owned his work. On cross-examination he admitted that he knew nothing about copyright law. Several times during his 23 years with Harvey, Alfred Harvey referred to him as an employee. The first time was when he began with the company in 1954. Alfred told him he wanted him to work full-time and said, "I'm welcoming you to the Harvey family as an employee." He also said, "Fred, now you are officially employed." A second occasion soon thereafter was when Rhoads told Alfred he wanted to move to Florida. Rhoads related that conversation as follows:

I told him, I said, "I just left this job with Mort and he offered me ten percent of everything he is going to have in his two strips. And, I just want to know where I stand." As a matter of fact, I said, "Can we have a contract?"

He said, "Fred, you don't need a contract. You are an employee and everything is going to be fine, and you can go to Florida or anywhere you want to go, just so you mail your work in and get it in here on time," like I was doing in Connecticut.

Another time was in 1973 when he was placed on a group hospitalization plan. This came about after an illness requiring hospitalization. Since he had not been in the plan he had to pay those bills personally. Upon learning this, Alfred Harvey said it never should have happened, "Fred is an employee, we should have him on the hospitalization plan. We'll put him on it right away." Actually the hospital plan was a group policy Harvey procured for the freelance artists so they could have such insurance. The company paid the premium and was reimbursed by Rhoads and the other artists. The company had another hospital plan for the employees which it paid as a fringe benefit.

Mrs. Rhoads also testified to a telephone conversation with Alfred Harvey in August 1977:

He told me that time that Fred had been such a good employee, that Fred has just been outstanding as far as his

creation of work of Sad Sack. And he said to me then, "I'll always look out for you and Fred. You don't have to worry."

There were also informal references to Rhoads as an "employee" in correspondence from Harvey to Rhoads.

Rhoads was paid upon his submission of statements for work completed. In about 1959, after he had been with Harvey for five years, the checks in payment of his services included the following endorsement language on the back:

> Check void if this endorsement altered.
>
> This check is accepted in payment in full [sic] for all of the undersigned's right, title and interest of whatsoever kind or nature, in and to the copy, art, continuity, characters, idea, planning, strip, story, or manuscript, and to the title, name or mark identified therewith, for all of which properties this check is issued.
>
> Without limiting the foregoing, the undersigned confirms that the maker of this check and/or assignes [sic] are given full and unrestricted rights to use any and all said property for any and all uses and to make any and all changes thereof.
>
> Endorser is author or accredited agent in this sale and guarantees that the work or property is free from libel or infringement.
>
> Signed _____.

He endorsed these checks for the following 18 years without questioning Harvey or anyone about this language. His explanation was that he needed the money and thought he was an employee and Harvey owned his work anyway.

The appellees concede that he was not an employee. Other facts which might arguably have indicated employment were apparently introduced to show other ways in which he was led to believe he was an employee. For example, he was given Christmas bonuses and vacation pay. However, on the question of his real status the appellants introduced evidence showing that Rhoads did not receive W-2 forms but rather 1099 forms reporting the income paid to him, that he filed his tax returns as a self-employed person, and that he paid self-employment taxes.

■ In this appeal two issues are presented which we find dispositive. The appellants contend, first, that the trial court should have granted their motion for directed verdict because of the insufficiency of the evidence. And, second, that a directed verdict should have been granted because the appellees' claim was barred by the statute of limitations. We agree with both contentions and reverse and remand with directions to dismiss the complaint and enter judgment for the appellants.

In *Rhoads II* which reversed the summary judgment, we recognized that Harvey was urging new grounds on appeal to support the trial court's action. Since Rhoads had no opportunity in the trial court to show facts controverting those grounds we refused to affirm. One of those grounds was the lack of materiality of Rhoads's status with Harvey, one of the nine necessary elements of fraud. *Rhoads II.* Specifically, since either an employee or an independent contractor were equally able to reserve copyrights to work done for hire,[1] Harvey contended that even if they told Rhoads he was an employee, despite his real status as an independent contractor, this misrepresentation was immaterial.

We held, however, that there were conceivable facts under which the misrepresentation could be material. Specifically, if Rhoads believed that only an independent contractor could retain copyrights *and this was known or should have been known to Harvey,* then the false representation of Rhoads's status was material. These, then, were facts which our reversal of the

---

1. See *Brattleboro Publishing Co. v. Winmill Publishing Corp.,* 369 F.2d 565 (2nd Cir.1966); 17 U.S.C. § 201(b) (1978) (originally enacted as 17 U.S.C. § 26); *and see Picture Music, Inc. v. Bourne, Inc.,* 457 F.2d 1213 (2nd Cir.1972), cert. den. 409 U.S. 997, 93 S.Ct. 320, 34 L.Ed.2d 262 (1972); *Gustave v. Zuppiger,* 24 Ariz.App. 557, 540 P.2d 176 (1975).

summary judgment gave Rhoads an opportunity to produce.

We do not mean to suggest that after the mandate issued in *Rhoads II*, this was the only theory upon which Rhoads could recover. Indeed Rhoads was permitted to amend the complaint in the trial court to plead a new count in constructive fraud. In that count he alleged that a confidential relationship existed between the parties giving rise to a duty on Harvey's part to make full disclosure of his legal rights. In fact, the case was tried on both the theory of fraud and the duty imposed by the alleged confidential relationship. The trial court directed a verdict in favor of Harvey on the constructive fraud count and the appellees have submitted that as error by cross-issue in this appeal. We will address that ruling later in this opinion. Suffice it to say here that we agree with the trial court's ruling on that issue.

The appellees concede that there is no direct evidence that Harvey knew that Rhoads believed he could not have retained rights in his work if he were an employee. They argue that this element of fraud, i.e., the materiality of the representation, is proven by circumstantial evidence. However, the only circumstantial evidence which they contend supports such an inference is the misrepresentation itself. In other words they argue, why would they tell him he was an employee if they did not know, or have reason to know, that he believed an employee could not copyright his work? The law does not permit such a speculative leap. Given the fact that the volume of work assigned to Rhoads kept him busy most of the time, a schedule intended from the beginning, it only makes sense that Harvey would refer to him in a friendly, non-legal sense as an "employee." In the context of the conversations to which we have referred, it would have been most unusual for Harvey to have referred to Rhoads as an "independent contractor" or a "free-lance artist." As the appellants argue, one would be amazed if Alfred Har-

vey had said, "Welcome to the Harvey family as an independent contractor."

Other evidence helps to explain the several references to Rhoads as an employee. Harvey exercised strict control over the work of the artists. Animation guides were furnished to them so that each character would be uniform regardless of who did the drawing. The intimate details of each cartoon character were controlled including the size of noses, location of chins, the dots in the chevron on Sad Sack's uniform, and the amount of hair on Nap Sack's head. On one occasion Rhoads was given a written reprimand for creating a new character without prior permission.

Likewise the other conduct which the appellees claim was a part of the fraudulent scheme, the bonuses and the vacation pay, is consistent with the recognition of valuable services performed and the maintenance of good-will. Fraud will not be presumed. Rather, actions based on fraud must be proven by clear and convincing evidence; *General Accident Fire & Life Assurance Corp. v. Little*, 103 Ariz. 435, 443 P.2d 690 (1968). The proof of fraud must be sufficient to overcome the initial presumption of honesty. Each and all of the elements of fraud must be proved. *In Re McDonnell's Estate*, 65 Ariz. 248, 179 P.2d 238 (1947).

Since it is our obligation to affirm the trial court if possible, we have carefully reviewed the entire record on appeal. We have found no evidence to support fraud. We are unable to attach any legal significance to other arguments advanced by the appellees. Rhoads was told he did not need a written contract. That answer in response to his inquiry was correct. There was no misrepresentation. Rhoads was told he was a "staff member" and a "trusted and valued member of the Harvey family." Those words are not actionable. Rhoads was told that as the company grew, he would grow and would be taken care of. Such a promise is far too indefinite to war-

rant reliance. *See Berry v. Robotka*, 9 Ariz.App. 461, 453 P.2d 972 (1969) (referring to a land contract).

■ Turning now to the appellants' contention that the three year statute of limitations for fraud barred the action (A.R.S. § 12–543). The statute commenced to run when Rhoads knew, or through due diligence should have known, of any fraud, *Condos v. United Benefit Life Insurance Co.*, 93 Ariz. 143, 379 P.2d 129 (1963); *Guerin v. American Smelting and Refining Co.*, 28 Ariz. 160, 236 P. 684 (1925). *And see Richards v. Powercraft Homes, Inc.*, 139 Ariz. 264, 678 P.2d 449 (App.1983) approved in part, vacated in part, 139 Ariz. 242, 678 P.2d 427 (1984).

This action was commenced May 26, 1978, almost 24 years after Rhoads went to work for Harvey. Assuming, arguendo, that he was not put on inquiry when he received his first tax form rather than the W–2 he was used to getting from previous employers, he was surely alerted when the form endorsement appeared on the back of his checks in 1959. We believe a reasonable person would have questioned someone about his rights sometime during the ensuing 18 years. The appellants cite a North Carolina opinion which we find most persuasive, *Hiatt v. Burlington Industries, Inc.*, 55 N.C.App. 523, 286 S.E.2d 566 (1982). In *Hiatt* a former employee sued his employer for fraudulent assignment of his interest in a device for dyeing textile fabrics. Hiatt invented the apparatus in 1963 while working for Burlington. He worked for Burlington for over fourteen years, retiring in 1977. In 1980, he filed an action for fraud after reading a law article on patents.

Burlington contended that the three-year statute of limitations for fraud had run because Hiatt knew, or through due diligence should have known, about the contents of the assignment agreement that he signed in 1963. Both the trial court and the North Carolina Court of Appeals

agreed. The *Hiatt* court held, as a matter of law, that "plaintiff knew, or with due diligence should have known, the facts constituting the alleged fraud. He waited too long to initiate this action which is, consequently, barred by the statute of limitations." 286 S.E.2d at 570. The rationale for the requirement of due diligence in discovering fraud is that:

> A man should not be allowed to close his eyes to facts readily observable by ordinary attention, and maintain for his own advantage the position of ignorance. Such a principle would enable a careless man, and by reason of his carelessness, to extend his right to recover for an indefinite length of time, and thus defeat the very purpose the statute was designed and framed to accomplish. *Peacock v. Barnes*, 142 N.C. 215, 218, 55 S.E. 99, 100 (1906), as quoted in *Hiatt, supra*, [286 S.E.2d] at 568.

Numerous cases from Arizona and other jurisdictions are in accord. *See, e.g., Tovrea Land & Cattle Co. v. Linsenmeyer*, 100 Ariz. 107, 412 P.2d 47 (1966) (statute of limitations runs from time aggrieved party should have discovered fraud in the exercise of reasonable care and diligence); *Hadra v. Herman Blum Consulting Engineers*, 632 F.2d 1242 (5th Cir.1980) cert. den. 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981); *Klein v. Bower*, 421 F.2d 338 (2d Cir.1970) (statutory period for fraud action "did not await appellant's leisurely discovery of the full details of the alleged scheme"); *First Federal Savings and Loan Ass'n. v. Mortgage Corporation of the South*, 467 F.Supp. 943 (N.D.Ala. 1979), aff'd 650 F.2d 1376 (1981); *Sasso v. Koehler*, 451 F.Supp. 933 (D.Md.1978); In this case, Rhoads, through due diligence, should have discovered by 1959 or soon thereafter the fraud he alleges occurred.

The trial court submitted the statute of limitations defense to the jury. The issue should have been decided as a matter of law in favor of the appellants. In the trial court the appellees argued that the statute

did not commence to run until 1977 when Harvey ceased sending work to Rhoads. They fail to point out why this circumstance gave Rhoads any reason to know of or suspect the alleged fraud. It is understandable that the unilateral termination of the 23-year relationship might cause resentment on Rhoads's part, and that may explain why he finally sought advice of counsel, but that does not excuse his failure to do something much, much earlier.

Finally, the appellees present as a cross-issue the trial court's dismissal of their count in constructive fraud. It is the appellees' position that a confidential or fiduciary relationship existed between Rhoads and the Harveys. Based upon that alleged relationship, they contend that the Harveys breached their duty to make a full and complete disclosure to Rhoads concerning his right to retain an interest in his art work. The trial court granted the Harveys' motion for directed verdict, finding as a matter of law that no evidence justified a finding of a confidential relationship. The trial judge remarked in ruling on the motion, "I just don't think you can establish a confidential relationship on the basis of going to a party or going to a bar mitzvah."

■ The appellees first contend that whether a confidential relationship exists is a question of fact. This is unquestionably correct provided there is sufficient evidence to submit the issue. When the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue. *Apolito v. Johnson*, 3 Ariz.App. 232, 413 P.2d 291 (1966), modified on denial of reh'g, 3 Ariz.App. 358, 414 P.2d 442 (1966); *Brazee v. Morris*, 68 Ariz. 224, 204 P.2d 475 (1949), wherein our supreme court said,

> From the record we can say as a matter of law that no confidential relationship can be found to have existed between the parties. Brazee was neither a relative, confidant, nor advisor of Morris, and they operated at arm's length throughout all of their dealings. 68 Ariz. at 229, 204 P.2d 475.

And in *Herz & Lewis, Inc. v. Union Bank*, 22 Ariz.App. 437, 528 P.2d 188 (1974), our court affirmed a summary judgment in favor of the defendant bank where one of the theories presented was constructive fraud. While recognizing that the existence or non-existence of a confidential relationship is usually a question of fact, the court held that under the facts of that case it was decided properly as a matter of law.

■ In their discussion of this issue in their brief, the appellees do not refer us to evidence which they contend supports a finding of a confidential relationship. From our review of the record we believe they must be relying on the business relationship between Rhoads and Harvey coupled with some social contacts over the 23 years. We have discussed the business relationship in some detail. There were frequent business contacts between Rhoads and Harvey officers by phone and correspondence but very few in person over the 23 years. The business correspondence, although cordial, suggests no confidential relationship. In addition there were at least four social contacts: (1) in 1958 at a special showing of the movie "Sad Sack," (2) in 1960 at a party at the Harveys' apartment in Manhattan, (3) in 1973 at the Harveys' home in Larchmont, and (4) in 1977 at a bar mitzvah. The Harveys and the Rhoadses also occasionally exchanged gifts and "cards on holidays."

■ Constructive fraud, as contrasted to actual fraud, is a breach of legal or equitable duty which, irrespective of the moral guilt or intent of the party charged, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Dishonesty of purpose and intent to deceive are not essential elements of constructive fraud. *Bell v. Bell*, 44 Ariz. 520, 39 P.2d 629 (1934) (guardian and minor wards). Where a relation of trust and confidence exists between two parties so that one of them places peculiar reliance in the trustworthiness of another, the latter is under a duty to make a full and

truthful disclosure of all material facts and is liable for misrepresentation or concealment. The breach of this duty gives rise to an action in constructive fraud. *Stewart v. Phoenix National Bank*, 49 Ariz. 34, 64 P.2d 101 (1937) (bank which gave financial advice to customer for 23 years). The *Stewart* opinion observes that the doctrine of confidential relations has been applied to husband and wife, parent and child, guardian and ward, attorney and client, partners, and joint adventurers and that ordinarily it would not apply to the debtor-creditor relationship of a bank and depositor. To establish a fiduciary (confidential) relationship there must be something approximating business agency, professional relationship, or family tie. *In Re McDonnell's Estate, supra*. In *McDonnell* our supreme court adopts the following definition from 37 C.J.S. Fraud, § 2(2), pp. 213–214:

> [A] confidential relation ... is a relation of parties in which one is bound to act for the benefit of the other and can take no advantage to himself from his acts relating to the interest of the other ... it is denied that ... mere confidence or implicit faith in another's honesty and integrity is sufficient to constitute a fiduciary or confidential relationship. So too, me. friendly relations are insufficient for this purpose. 65 Ariz. at 253, 179 P.2d 238.

Later Arizona cases involve such relationships. *See Condos v. Felder*, 92 Ariz. 366, 377 P.2d 305 (1962) (partner and illiterate partner); *Hassenpflug v. Jones*, 84 Ariz. 33, 323 P.2d 296 (1958) (broker and client); *Murillo v. Hernandez*, 79 Ariz. 1, 281 P.2d 786 (1955) (family relationship); *Leigh v. Loyd*, 74 Ariz. 84, 244 P.2d 356 (1952) (real estate agent and principal); *Haymes v. Rogers*, 70 Ariz. 408, 222 P.2d 789 (1950) (real estate broker and principal). In *Condos* our supreme court further explains the law of confidential relationship and constructive fraud by quoting with approval 3 Bogert on Trusts and Trustees, Part 1, § 482, 1946 Ed.:

There is no uniform practice among the courts in their use of the phrases "fiduciary relation" and "confidential relation." In many decisions the words are used as synonyms. In most cases, however, the latter phrase ... [does] not [fall] into any well-defined category of the law. The relations of trustee and cestui, executor or administrator and creditors, next of kin or legatees, guardian and ward, principal and agent, attorney and client, corporate director and corporation, and the like are easily thrown into distinct subdivisions of the law. They have distinctive names. The term "fiduciary" might well be reserved for such relations.

But there are other cases where there is just as great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative, but where the law has no special designation for the position of the parties. It cannot be called trust or executorship, and yet it is so similar in its creation and operation that it should have like results. 92 Ariz. at 371, 377 P.2d 305.

Our court has also discussed the quantum of evidence necessary to show a confidential relationship for constructive fraud, finding the evidence sufficient in *In Re Guardianship of Chandos*, 18 Ariz.App. 583, 504 P.2d 524 (1972) (guardian and ward) and insufficient in *Klinger v. Hummel*, 11 Ariz.App. 356, 464 P.2d 676 (1970) (buyer and seller of real estate). Obviously there was no fiduciary relationship existing between Rhoads and Harvey. Likewise there was no great intimacy, disclosure of secrets, or entrusting of power. Any superiority of position is no different than that which would exist between any master and servant or employer-employee. The relationship was not akin to a trust or executorship.

We find no Arizona case involving a confidential relationship between employer and employee. We believe such a relationship

could certainly be found if other facts were present. *See Reed v. A. E. Little Co.*, 256 Mass. 442, 152 N.E. 918 (1926) (involving an employment relationship and the exchange of confidential information). The appellees have cited *Roberts v. Sears, Roebuck and Co.*, 573 F.2d 976 (7th Cir.1978) cert. den. 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168, support of their position on this issue. The facts of *Sears* are such that one must wonder why the opinion even discusses confidential relationship. The case is one of actual fraud. Sears purchased the patent rights to an invention of a former employee for a pittance by representing to him that his invention was not new, that its cost would be 40 cents to 50 cents, that it would sell only to the extent it was promoted, that it was only worth a certain amount, and finally that Sears might not even maintain sales on the item. Sears also represented that no patent had issued. All of these representations were false and Sears knew them to be false.

Nevertheless the *Sears* court does discuss confidential relationship. That discussion is of no benefit to the appellees, however, since the opinion holds that the determination to be made is whether one person reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. The *Sears* court found five factors to be relevant to that inquiry, including the disparity of age, education, and business experience of the parties, the existence of an employment relationship, and the exchange of confidential information. The *Sears* plaintiff was eighteen when he invented his socket wrench. He had a high school education and no business experience. He was an employee of Sears when he invented the wrench and he showed his invention to the manager of the store where he worked as a sales clerk. At first glance it may appear that Rhoads, who had only a high school education and who had an "employment relationship" with the Harveys, might arguably be in a comparable position. However, there is no exchange of confidential information, Rhoads had previous business experience, and he was considerably older than eighteen. Further, we are persuaded that the facts of *Sears* show actual fraud. Immediately after the discussion of the five factors, the court notes that in addition, one of Sears's witnesses admitted that the company expected the plaintiff to believe and to rely upon the various representations made to him. We are not persuaded that *Sears* required the trial court to send this issue to the jury.

We find it unnecessary to consider the other issues presented by the appellants. The evidence was insufficient to support either fraud or constructive fraud and the statute of limitations clearly bars the action.

Reversed and remanded with instructions to enter judgment in favor of the appellants.

HATHAWAY and HOWARD, JJ., concur.