Before: CHAMBERS, KOZINSKI and NOONAN, Circuit Judges.

## ORDER

The certification order and dissent filed on December 17, 1990 is redesignated a published order.

## ORDER

1. This Court certifies that resolution by the Arizona Supreme Court of the following question of law set forth in Paragraph 2 will be determinative of a significant substantial question of law in the above-captioned case.

2. Under Arizona law, would a person who gratuitously undertook to lend money to a person who then relied on his offer of the loan be liable under Restatement (Second) of Torts § 323 (1965) and *McCutchen v. Hill*, 147 Ariz. 401, 710 P.2d 1056 (1985) if he negligently failed to make the loan, causing economic harm to the would-be borrower?

3. Counsel for the parties are Paul Carroll, Pro Se, 5205 West Thunderbird, # 1004, Glendale, Arizona 85306, (602) 938–6990 and Richard G. Patrick, Assistant United States Attorney, 230 North 1st Avenue, Room 4000, Phoenix, Arizona, 85025, (602) 261–3011.

4. No party to this certification process will be allowed to request attorney's fees or any costs associated with this certification process.

5. This Order is effective fourteen (14) days after the date thereof.

6. The Order and six (6) certified copies shall be forwarded, under seal, to the Arizona Supreme Court by the Clerk of the Ninth Circuit Court.

DATED this 17th day of December, 1990.

KOZINSKI, Circuit Judge, dissenting:

The Arizona Supreme Court's answer to the question presented by my colleagues has no bearing at all on this case, which involves an agency of the United States Government, not a gratuitous lender. The theory that underlies the majority's ques-

Beverly CARROLL, et al., Appellants–Plaintiffs,

v.

UNITED STATES of America, Appellee–Defendant.

No. 89–15178.

United States Court of Appeals, Ninth Circuit.

Jan. 18, 1991.

Paul Carroll, pro. per., Glendale, Ariz., for plaintiffs-appellants.

Richard G. Patrick, Asst. U.S. Atty., Phoenix, Ariz., for defendant-appellee.

tion appears to be that, because the government makes FmHA loans gratuitously, the appropriate private party analogue is the good samaritan. This is not, and never has been, the law. The good samaritan doctrine has been carefully circumscribed by the federal courts; it normally applies only where the activity in question has no analogue in the private sector. See, for example, *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (operation of a lighthouse); *Gill v. United States,* 429 F.2d 1072, 1075 (5th Cir.1970) (furnishing in-flight weather information to airplane pilots); *Creasy v. United States,* 645 F.Supp. 853 (W.D.Va.1986) (inspection and repair of premises); and *Barnson v. United States,* 531 F.Supp. 614 (D.Utah 1982) (inspection of mines). Here, there *is* a private sector analogue: a private commercial lender; there is no need to and no authority for resorting to a good samaritan theory.

Moreover, the question posed by my colleagues suffers from all the shortcomings of a hypothetical question. To begin with, it glosses over an important and difficult issue: whether the loans plaintiffs applied for were truly gratuitous. They were certainly not gratuitous as that term is normally understood, as borrowers do pay interest on FmHA loans, at a rate set by the Secretary of Agriculture. 7 U.S.C. § 1964(b). The FmHA also guarantees loans made by private lenders and, occasionally, provides interest rate subsidies. Id. at §§ 1963, 1964(c). In either event, the borrower pays interest, albeit at a reduced rate.

The simple hypothetical question presented by my colleagues does not capture this complex series of relationships. To understand just what is being asked of it, the Arizona Supreme Court will have to examine the record before us, which will require review and analysis of plaintiffs' loan application, construction of FmHA's governing statute and regulations and, quite possibly, an inquiry into the relationship between the market interest rates and the rates plaintiffs would have qualified for, had their loan application been approved. Without a firm understanding of all these factors,

how is the Arizona Supreme Court supposed to know the extent to which the transaction here, in fact, involved a gratuitous lender? In order to provide a meaningful answer to the question posed by the majority, the state supreme court will have to answer complex questions of federal law.

Which brings me to my next objection: I doubt we have the authority to send the United States off to litigate this issue before the state court. The federal courts have exclusive jurisdiction over all matters involving the United States; an action against an officer or agency of the United States brought in state court may be removed. It is unheard of, as far as I am aware, to reverse the process by sending a case involving the United States from federal court to state court. The United States, as a sovereign entity, may not be required to submit itself to the authority of another sovereign. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824). Certainly no authority exists for forcing the United States to pay a filing fee to the Arizona Supreme Court. Yet, under the certification order and the applicable statutory provisions, the United States will be required to pay half of the Arizona Supreme Court's filing fee. Ariz.Rev.Stat. § 12–1865. Forcing the United States to participate in a proceeding where it will be required to submit to the jurisdiction of, and pay a fee to, a state instrumentality violates principles established as far back as *McCulloch.*

Finally, this exercise will be a waste of time for the parties and our colleagues on the Arizona Supreme Court, as we are perfectly capable of answering the question presented ourselves. As the learned district judge correctly held, the plaintiffs failed to show that Arizona would hold a commercial lender in the government's position liable under these circumstances. *Memorandum and Order,* January 9, 1989, ER Tab 20, at 6–8, citing *Rhoads v. Harvey Publications, Inc.,* 145 Ariz. 142, 700 P.2d 840, 846–47 (App.1984) and *Rawl-*

*ings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 569, 574–75 (1986). It is inconceivable that the liability of a gratuitous lender would be greater than that of a commercial one. After all, a commercial lender makes a profit and is therefore able to amortize the risk of liability by raising its rates; a gratuitous lender has no such option. Its liability under section 323 of the Restatement therefore should be less, and certainly cannot be greater, than that of a commercial lender. If we conclude, as I submit we must, that a commercial lender in defendant's position would not be liable, it seems out of the question that liability would be imposed on a good samaritan for similar conduct. Another panel of this court certainly had no difficulty disposing of the identical question, even without any state case law to guide it. *Love v. United States,* 915 F.2d 1242, 1248–49 (9th Cir. 1990).

The Justices of the Arizona Supreme Court have discretion to decline our certification request. Ariz.Rev.Stat. § 12–1861; *Joseph v. Pima County,* 158 Ariz. 250, 762 P.2d 537 (1988). I respectfully suggest that this is an appropriate case for an exercise of that discretion. The question presented is entirely hypothetical; it is unlikely to assist in the development of the law of Arizona, as there will be few situations, if any, where this case will provide a useful precedent; it will not advance the resolution of the dispute before our court, which hinges not on state law, but on the more fundamental question whether a good samaritan theory has any relevance to this case at all; it will embroil the state court in questions of federal law; it will require the state court to exercise jurisdiction over the United States in a situation where its authority to do so is without precedent; and the question presented is susceptible to only one rational answer. This is a federal problem for the federal courts to resolve; we have no business burdening the state court with this issue. The "better policy" in such circumstances is for the Arizona

Supreme Court to just say no. *Joseph,* 762 P.2d at 538.