**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**RAUSCHER PIERCE REFSNES, INC., James R. Feltham and Dain Rauscher Inc., Defendants.**

**No. CIV–98–0027–PHX–ROS.**

United States District Court, D. Arizona.

Aug. 24, 1998.

---

Peter H. Bresnan, Securities & Exchange Commission, Washington, DC, for Securities and Exchange Commission.

Joel Philip Hoxie, David Eric Rauch, Snell & Wilmer LLP, Phoenix, AZ, for Rauscher Pierce Refsnes, Inc., James R. Feltham and Dain Rauscher Inc.

## AMENDED ORDER

SILVER, District Judge.

### BACKGROUND

In 1988, the Department of Administration of the State of Arizona (the "DOA") issued $121,830,000 of tax-exempt certificates of participation (the "1988 COPs") to finance the construction of six state buildings. The 1988 COPs could not be redeemed until July of 1998, and bore an average interest rate of 7.55%. In 1990, Defendant Rauscher Pierce Refsnes, Inc.[1] ("Rauscher") became the financial adviser to the DOA for lease purchases and bond transactions. Rauscher's contract was renewed by the DOA in 1991 and 1992. By 1992, interest rates had fallen well below the 7.55% the state was paying on its 1988 COPs, and Defendants recommended that the DOA take advantage of this situation by advance refunding the 1988 COPs. (Compl.¶ 14.) Defendants advised the DOA to issue new tax-exempt municipal securities (the "1992B COPs") bearing a lower interest rate than that of the 1988 COPs, and invest the proceeds into United States Treasury securities, to be held in an escrow account and used to make debt service payments on the 1988 COPs until they were redeemed in 1998. *Id.* In addition to providing the DOA with advice on the 1992B COPs offering, Defendants assigned themselves the responsibility of selling the DOA the United

---

1. Rauscher Pierce Refsnes, Inc., was a Delaware corporation with its principal place of business in Dallas, Texas. (Rauscher Mot. at 2.) On January 2, 1998, Rauscher merged with its sister company, Dain Bosworth Incorporated, to become Dain Rauscher. *Id.* Dain Rauscher then merged with a Minnesota corporation to become Dain Rauscher Incorporated. *Id.* James Feltham was the Senior Vice President at Rauscher's Phoenix office who supervised Rauscher's participation in the 1992B COPs offering. *Id.*

States Treasury securities it would buy with the proceeds from the 1992B COPs bond offering. *Id.* ¶ 18.

On June 10, 1992, the underwriters of the 1992 offering priced the 1992B COPs. On that same day, Defendants purchased a portfolio of Treasury securities and priced them for delivery on June 16, 1992. *Id.* ¶ 19. On June 16, 1992, the bond offering closed with the DOA issuing $129,640,000 of the 1992B COPs. The proceeds from the sale were turned over to an escrow trustee who then bought the Defendants' portfolio of United States Treasury securities. *Id.* Plaintiff, the Securities Exchange Commission (the "SEC"), filed a lawsuit against Defendants on January 8, 1998, alleging that during their participation in the 1992B COPs offering, Defendants violated federal securities laws by making materially false and misleading statements in connection with the sale of securities, by omitting to disclose material information that they were under a duty to disclose, and by charging their client excessive markups. Plaintiff requests that this Court order Defendants to return the profits from their allegedly illegal conduct, impose civil penalties upon Defendants, and enjoin Defendants from violating the securities laws in the future. On March 31, 1998, Defendants James Feltham and Dain Rauscher filed motions to dismiss the Amended Complaint (hereinafter "Complaint") in its entirety, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

On August 7, 1998, the Court conducted oral argument and took the matter under advisement. The Court has resolved to deny Defendants' motions to dismiss, but also to allow Plaintiff to allege with particularity the market standard.

## LEGAL STANDARD

■ The Ninth Circuit Court of Appeals has held that "the conditions that must be met before a motion may be granted under Fed.R.Civ.P. 12(b)(6) are quite strict." *Church of Scientology of California v. Flynn,* 744 F.2d 694, 695–96 (9th Cir.1984). This Court may only dismiss the Complaint if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* 744 F.2d at 696 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering a motion to dismiss, this Court must take "as true the facts alleged in the complaint ... drawing all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994).

## DISCUSSION

Plaintiff argues that it has adequately stated three claims in its Complaint. First, Plaintiff asserts that Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)[2]; Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5[3]; and Sections 206(1),

---

**2.** The relevant portion of 15 U.S.C. § 77q states:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly-
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1), (2), (3).

**3.** Rule 10b–5 states:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national security exchanges
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

(2), and (3) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6[4]; by making false and misleading statements in the tax compliance certificate they issued to the DOA's bond counsel. Second, Plaintiff asserts that Defendants violated the aforementioned statutes by failing to disclose material information concerning their sale of Treasury securities to their client the DOA. Third, Plaintiff contends that Defendants violated the aforementioned statutes by failing to disclose that they were charging the DOA excessive markups on the Treasury securities they sold them. Defendants contend that Plaintiff has pled no facts in support of its allegations, and therefore, this Court must dismiss each claim pursuant to Rule 12(b)(6) for failure to state a claim. Each of Plaintiff's claims will be examined in turn.

## A. Plaintiff's Claim of False and Misleading Statements

■ In order for Plaintiff to succeed in proving a claim of securities fraud, Plaintiff must prove that "(1) in connection with the purchase or sale of a security; (2) the defendant acting with scienter[5]; (3) made a material misrepresentation ...." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir.1998). Because Plaintiff's claim involves fraud, Rule 9(b) requires that "the circumstances constituting fraud or mistake, shall be stated with particularity." Fed. R.Civ.P. 9(b). This requirement of particu-

larity "usually requires the claimant to allege at a minimum the identity of the person who made the fraudulent statement, the time, place, and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated." 2 James Wm. Moore, *Moore's Federal Practice* § 9.03[1][b] (3d ed.1998). In addition to these minimum requirements, the Ninth Circuit has held that in order to satisfy Rule 9(b) in a securities fraud case:

> a plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading.

*In re GlenFed, Inc., Securities Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc). The Ninth Circuit has explained that "a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996).

■ There can be no question that Plaintiff has met the minimum requirements for

17 C.F.R. § 240.10b–5.

**4.** The relevant portion of 15 U.S.C. § 80b–6 provides:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly–

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and the obtaining consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transac-

tion with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;

15 U.S.C. § 80b–6(1),(2),(3).

**5.** The Supreme Court has held that scienter is a requirement for claims brought under Rule 10b–5 and 15 U.S.C. § 77q (a)(1), but that no scienter requirement exists for claims brought under 15 U.S.C. § 77q(a)(2),(3). *Aaron v. SEC*, 446 U.S. 680, 695–97, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The Supreme Court has also held that no scienter requirement exists for claims brought under Section 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b–6(2). *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The Supreme Court has not determined whether scienter is required for claims brought under Section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b–6(1), but lower courts have held that it is required. *See SEC v. W. Steadman*, 967 F.2d 636, 641 (D.C.Cir.1992).

pleading fraud.[6] The only remaining question is whether Plaintiff has adequately explained what is false about each of Defendants' statements. Plaintiff argues that its complaint adequately explains which statements were false and the reasons why each was false or misleading. Defendants argue that Plaintiff's complaint is insufficient because Plaintiff cites no facts and relies entirely on conclusory allegations of fraud to explain why Defendants' statements are false.[7] Plaintiff is only required to identify which of Defendants' statements are false or misleading, and explain why those statements were false or misleading when they were made. Plaintiff has met the burden.

Plaintiff contends that Defendants' statement that the sale of the escrow securities "was an arm's length transaction" is false and misleading because Defendants were involved on both sides of the transaction. (Compl.¶ 33.) Plaintiff alleges that Defendants recommended to the DOA that they buy securities, and then sold the DOA the securities they recommended it buy. *Id.* ¶ 18. Plaintiff alleges that it was impossible for Defendants to truthfully state in the Certificate that the transaction was made at arm's length in light of Defendants' fiduciary relationship with the DOA and their undisclosed material financial interest in the sale of the securities. *Id.* ¶ 33. Defendants argue that the statement was not false because the sale was conducted at arm's length, meaning the sale was between a willing buyer and a willing seller. (Rauscher Reply at 22.) Defendants further contend that Plaintiff's allegation that a financial adviser cannot enter into an "arm's length" transaction with an issuer client for tax purposes is contrary to the SEC and IRS regulations that existed in 1992, which allowed interested sellers to state that they sold securities in an arm's length transaction. (Rauscher Reply at 16–17.) These arguments go to Plaintiff's ultimate ability to prove this allegation, they do not establish that Plaintiff cannot, as a matter of law, prove that the statement was misleading or false.

Plaintiff's second allegation is that Defendants' statement that the escrow securities were priced "without regard to any amount paid to reduce the yield" and that "the price was no higher than the price Rauscher would have charged any other customer ... in a transaction in which the yield on the [escrow securities] was not subject to any limitation" is false. (Compl.¶ 34.) Plaintiff contends that this statement is false because at the time Rauscher priced the escrow securities it knew or should have known that a positive arbitrage situation existed and priced the securities in part on the amount of the yield that was available to be burned. *Id.* In essence, Plaintiff alleges that Defendants did charge the DOA a higher price than they would have charged other customers because they knew the yield could be burned, and

---

**6.** The Complaint clearly alleges three false or misleading statements were made in a Tax Certification Certificate (the "Certificate") issued by Rauscher on June 16, 1992, knowing that the DOA's bond counsel would rely on the Certificate in rendering its opinion on whether the interest paid on the 1992B COPs would be tax-exempt. (Compl.¶¶ 30–31.)

**7.** In reality, Defendants' argument is that Plaintiff has not alleged enough facts, and that the facts that have been alleged cannot be proven. This argument is misplaced in a motion to dismiss. A court must take all of Plaintiff's allegations as true, and draw all reasonable inferences in Plaintiff's favor. Further, the Ninth Circuit has held that "[i]n certain cases, ... the requisite particularity might be supplied with great simplicity." *GlenFed*, 42 F.3d at 1548. The Ninth Circuit has indicated that securities fraud cases generally require a more detailed pleading because they:

often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competition, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.

*Id.* 42 F.3d at 1548. This is not the type of securities fraud noted in *GlenFed* because there was no "intervening catastrophe between the time the complained-of statement was made and the time a more sobering truth was revealed." *Id.* Accordingly, this is a securities fraud case where particularity may be satisfied with fewer facts.

that Defendant did burn the yield.[8] Defendants argue that this charge is merely a legal conclusion couched as a factual allegation, but Plaintiff has clearly identified why the statement is false.

Plaintiff's third allegation is that Defendants' statement that the escrow securities were priced "at fair market value" is false. *Id.* ¶ 32. Plaintiff contends that the statement is false because the securities were sold to the DOA at prices that exceeded "the mean of the bid and offered prices for those securities on an established market." *Id.* Plaintiff also contends that the statement is false because the securities were sold to the DOA at prices above the market price. *Id.* Plaintiff contends that if a firm charges a buyer a price higher than the market price, that firm can only claim that they sold the securities at fair market value, if the transaction was made at "arm's length without regard to any amount paid to reduce the yield on the obligation." *Id.* ¶¶ 17, 32. Plaintiff contends that Defendants' statement is false because Defendants charged a price above the market price in a transaction that was not made at arm's length without regard to any amount paid to reduce the yield on the obligation. *Id.* Defendants contend that the statement was not false because they were not issuing an opinion regarding whether the 1992B COPs would be tax exempt. (Rauscher Mot. at 24.) Defendants further contend that Treasury regulations defined "market price" as: (1) the actual price paid for the securities, if the securities are purchased in "an arm's length transaction without regard to any amount paid to reduce the yield"; or (2) the mean and bid offered prices published by appropriate publications on an established market price. *Id.* at 25. Plaintiff does not contend that only one definition of market value can apply; but that Defendants meet neither definition. (Compl. ¶¶ 17, 32.)

While Defendants have raised doubts concerning Plaintiff's ability to ultimately prove that a material misrepresentation was made, Defendants have not proved that Plaintiff cannot, as a matter of law, state a claim for misrepresentation under the Securities Act of 1933, 15 U.S.C. § 77q(a); the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5; and §§ 206(1), (2), and (3) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6.

## B. Plaintiff's Omission Claim Based on Fiduciary Duty

 For Plaintiff to succeed in proving an omissions claim Plaintiff must prove that "(1) in connection with the purchase or sale of a security; (2) the defendant acting with scienter [9]; (3) made … (where there exists a duty to speak) a material omission." *Grandon*, 147 F.3d 184, 188. Plaintiff's omission claim must also be pleaded with "particularity." Fed.R.Civ.P. 9(b). In addition to these requirements, Plaintiff must also establish that Defendants had an affirmative duty to disclose the disputed information. The Supreme Court held in *Basic Inc. v. Levinson*,

---

**8.** In a typical advance refunding transaction like the one in this case, the municipality issues a new offering of tax-exempt bonds to retire a pre-existing issue of bonds bearing higher interest rates. *See In Re Meridian Securities, Inc.*, SEC File No. 3–9582, 1998 WL 195679, at *3. The proceeds of the new bond offering are then invested in Treasury securities. *Id.* Federal Tax laws restrict the yield that issuers can receive on these investments to the yield on the new offering of bonds. *Id.* If investments generate a yield that is greater than the yield on the new offering of bonds, an impermissible arbitrage profit is created. *Id.* Under those circumstances, the Internal Revenue Service (the "IRS") could declare the bonds taxable. *Id.* IRS regulations effectively require that arbitrage profit be reduced by investing a portion of the account in State and Local Government Series—customized securities issued by the Treasury at below market interest

rates specifically for the purpose of allowing municipal issuers to comply with the IRS yield restrictions. *Id.*

The other way to circumvent the yield restrictions is through the practice known as yield burning. Yield burning occurs when a seller excessively increases the price an issuer pays for securities. *Id.* at 4. By adding unjustified markups to the price of advance refunding escrow securities, the refunding escrow's yield is artificially depressed below what it would have been had the securities been fairly priced. *Id.* In other words, the yield has been burned, and the broker has cheated the Treasury out of the arbitrage profit the municipalities would have had to pay to the Treasury, had the securities been fairly priced. *Id.*

**9.** *See supra* note 5.

485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." Even if the information that was not disclosed is deemed to be material, "there is no liability under Rule 10b–5 unless there is a duty to disclose it." *Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir.1992).

■ Plaintiff alleges that Defendants had a fiduciary relationship with the DOA which arose from their contract with the DOA, their relationship with the DOA, or both. (Compl.¶¶ 25, 26.) Plaintiff further alleges that Defendants' fiduciary relationship imposed a duty upon them to disclose all information material to the 1992 COPs issue, including all facts material to the DOA's purchase of the escrow securities. *Id.* ¶ 27. Plaintiff contends that Defendants failed to disclose prior to the closing of the 1992B COPs offering that: (1) Rauscher would act as principal for its own account in selling the escrow securities to DOA; (2) Rauscher would make a substantial profit from the sale; (3) the amount of the undisclosed profit; (4) the escrow could be purchased for a lower price from other dealers; (5) the prices DOA was charged exceeded the mean of the bid and offered prices for the securities on an established market; and (6) the profit received by Rauscher could jeopardize the tax exempt status of the 1992B COPs. *Id.* ¶ 28. Plaintiff asserts that these were material omissions that Defendants made knowingly, recklessly, or negligently. *Id.* Defendants deny that they had any statutory, regulatory, or fiduciary duty to disclose any of the aforementioned information to the DOA. (Rauscher Mot. at 13–20.) Accordingly, Defendants argue that Plaintiff's omissions claim must be dismissed because, even if the aforementioned information was material, they had no duty to disclose it to the DOA.

■ The Supreme Court has held that parties have a duty of disclosure to one another when a fiduciary or agency relationship exists, or when circumstances exist such that one party has placed trust and confidence in the other. *See Chiarella v. United States,* 445 U.S. 222, 232, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The Ninth Circuit has held that in order to determine whether a party has a duty to disclose, a court must examine: (1) the relationship of the parties, (2) their relative access to information, (3) the benefit that the defendant derives from the relationship, (4) the defendant's awareness that the plaintiff was relying upon the relationship in making his investment decision, and (5) the defendant's activity in initiating the transaction. *See Jett v. Sunderman,* 840 F.2d 1487, 1493 (9th Cir.1988). As part of the inquiry required by *Jett,* a court must look to Arizona law to determine if the relationship between the parties creates a fiduciary duty. Arizona courts have held that a fiduciary duty exists when there is a "great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative," and that "to establish a fiduciary (confidential) relationship there must be something approximating business agency, professional relationship, or family tie." *Rhoads v. Harvey Publications, Inc.,* 145 Ariz. 142, 700 P.2d 840, 847 (1984). The Arizona Supreme Court has held that a confidential relationship exists between a client and his or her financial adviser when there is an imbalance of knowledge so that the client relies heavily on the adviser for advice. *See Stewart v. Phoenix Nat'l Bank,* 49 Ariz. 34, 64 P.2d 101, 106 (1937)(holding that a confidential relationship existed when the bank had acted as the plaintiff's financial adviser for many years and he relied upon the bank's advice). Arizona and federal courts are in agreement that generally the question of whether a fiduciary relationship exists is a question of fact. *See Rhoads,* 700 P.2d at 846 *Firestone v. Firestone,* 76 F.3d 1205, 1211 (D.C.Cir. 1996). In *Rhoads,* the Arizona Court of Appeals held that the question of whether a confidential relationship exists is a question of fact "provided there is sufficient evidence to submit the issue." 700 P.2d at 846. In *Firestone,* the D.C. Circuit held that the "existence of a fiduciary relationship is a fact-intensive question involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties." 76 F.3d at 1211. While Defendants raise questions concerning Plaintiff's ability to ultimately prove their material

omissions claim, this Court finds that Plaintiff has alleged enough facts to state an omissions claim.

Plaintiff alleges that Defendants' financial advisory contract with the DOA created a fiduciary relationship between Defendants and the DOA. (Compl.¶ 25.) Plaintiff contends that the contract required Defendants to provide advice and assistance in all aspects of the issuance of the 1992B COPs. *Id.* Plaintiff further contends that the contract explicitly stated that the DOA would pay no expense for Defendants' services other than a financial advisory fee of $71,856 for the 1992B COP offering. *Id.* ¶ 13.

Defendants deny that their contract with the DOA created a fiduciary relationship. Defendants contend that there was no fiduciary relationship between the parties because the express terms of the contract provided that each party would "act in its individual capacity and not as an agent of the other." (Rauscher Mot. at 17.) Defendants claim that this case is indistinguishable · from *Gateway Technologies, Inc. v. MCI Telecommunications Corp.,* 64 F.3d 993, 1000 (5th Cir.1995), where the court found that contractual language similar to that found in Defendants' contract precluded a finding of fiduciary duty. *Gateway* is distinguishable. The contract in *Gateway* specifically stated that "[e]ach party shall act as an independent contractor and not as an agent for, partner of, joint venturer with the other party. The parties *create no other relationship outside* of that contemplated by the terms of the [s]ubcontract." *Id.* 64 F.3d at 1000 (emphasis added). Further,

the Fifth Circuit found, based on the relationship of the parties and the unambiguous language of the contract, "the parties intended no formal relationship which would impose fiduciary duties on MCI." *Id.* A close examination of the contract between the DOA and Defendants indicates that ambiguities exist, and that the contract could have created a fiduciary relationship despite the above language. Under the "Standard Terms and Conditions" portion of the contract, the contract states that "each party will act in its individual capacity and not as an agent, employee, partner, joint venturer, or associate of the other." (Rauscher Mot. Ex. A at 26.) However, "Part Two" of the contract, specifically discusses Rauscher's duties as financial adviser, states that Rauscher will "provide advice and assistance in all aspects of the lease purchase process." *Id.* at 13.

■■■■ Defendants further argue that in addition to the contract, the confirmation forms they sent to the DOA also establish that Defendants were not acting as the DOA's agents but as principals on their own account.[10] Defendants cite *Press v. Chemical Inv. Serv. Corp.,* 988 F.Supp. 375, 382 (S.D.N.Y.1997) as allegedly controlling. *Press* involved a one time transaction where Mr. Press bought a U.S. Treasury bill worth roughly $100,000 from Chemical Investment Securities. *Id.* 988 F.Supp. at 378. Further, the confirmation form sent by the defendant, the only contract between the parties, specifically stated that it was acting as principal. *Id.* 988 F.Supp. at 379. In addition, the court found that Press had pleaded no facts and made only conclusory allegations to sup-

**10.** Plaintiff did not refer to the confirmation forms in its complaint. Generally, a district court may not consider any material beyond the pleadings in a Rule 12(b)(6) motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). The Ninth Circuit has held that "a document is not 'outside' the complaint," only when "the complaint specifically refers to the document and if its authenticity is not questioned." *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). When matters outside the pleadings are presented to and not excluded by the court, a Rule 12(b)(6) motion is treated as one for summary judgment and disposed of as provided in Rule 56. This Court declines to convert this motion into a motion for summary judgment. *Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42 (2d Cir.1991) does not persuade this Court to consider the confirmation forms in this motion. In *Cortec,* the court held that "where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Id.* 949 F.2d at 48. In this case, Plaintiff did not rely on the confirmation forms to frame its Complaint. Further, in *Cortec* the plaintiff alleged that misrepresentations had been made in the forms, and then did not attach those forms to the complaint. Here, Plaintiff is not relying on the confirmation forms.

port the claim that the defendants were acting as his agent. *Id.* 988 F.Supp. at 381. Based on those facts, the court concluded that when a confirmation form *clearly* establishes that no fiduciary relationship exists, a court may reject a party's conclusory allegations that such a relationship exists.[11] *Id.* 988 F.Supp. at 382. In the instant case, Plaintiff has alleged facts to support its allegation that a fiduciary duty exists based on the contract. In addition to the contract, the parties had an ongoing business relationship which may have required Defendants to disclose, prior to the closing of the deal, that they were acting as principal in the sale of the securities. Because of the significant factual differences between *Press* and the instant case, this Court is not persuaded that *Press* controls the instant case. Assuming that the contract did not create a fiduciary relationship, contractual language does not preclude a finding that the parties' relationship gave rise to a confidential or fiduciary relationship. *See Gateway,* 64 F.3d at 1000 (finding that even though the contract did not create a fiduciary duty, the relationship between the parties could create such a duty).

Plaintiff alleges that Defendants' relationship gave rise to a fiduciary relationship that imposed duties on Defendants both during the issuance of the bonds and the sale of the securities. Plaintiff alleges that as DOA's financial adviser in connection with the 1992B COPs offering, Defendants assumed substantial responsibility for structuring the offering, preparing the necessary documentation, and advising the DOA regarding the allocation and investment of issue proceeds. (Compl.¶ 18.) Plaintiff alleges that only Rauscher had access to information concerning the prices it paid for the securities and the profit it reaped. *Id.* ¶ 21. Plaintiff contends that Defendants derived substantial benefits from its relationship with the DOA. *Id.* ¶ 22. Plaintiff alleges that Defendants made $707,037 on the sale of the treasury

securities, in addition to their $71,856 adviser fee, and that Feltham personally made over $100,000 on the deal. *Id.* Plaintiff further contends that Defendants knew, or should have known, that the DOA personnel responsible for the 1992B COPs offering were inexperienced with advance refunding transactions and relied heavily on their advice. *Id.* ¶ 31. As a result of their contractual duties, and the reliance of the DOA on Defendants, Plaintiff contends that Defendants had a fiduciary duty to provide the DOA with complete information and unbiased advice and assistance in all aspects of the 1992 COPs offering including the purchase of the escrow securities. *Id.* ¶ 4. Plaintiff has clearly pled enough facts to satisfy the state and federal standards for determining the existence of a fiduciary relationship.

Defendants argue that even if they had a fiduciary relationship with the DOA during the 1992B COPs offering, that fiduciary duty did not extend to the separate and independent transaction of providing the DOA with the United States Treasury securities for its escrow account. Defendants contend that they made it obvious to the DOA that they were not acting as a fiduciary in the sale of the securities by disclosing on the confirmation forms that they were acting as a "dealer" in "an arm's length transaction." (Rauscher Mot. at 18.) In essence, Defendants argue that they had no duty to disclose their markup on the sale of the Treasury securities to the DOA because it was a completely independent transaction from the DOA's 1992B COPs offering. Defendants contend that because they had no duty to disclose during the second transaction, *United States v. Cochran,* 109 F.3d 660 (10th Cir.1997) controls. In *Cochran,* the Tenth Circuit found that the absence of a "duty to disclose" was dispositive in a case involving fraud in a municipal securities transaction. *Id.* 109 F.3d at 667.

Defendants' reliance on *Cochran* is misplaced because the facts of *Cochran* are dis-

---

**11.** In addition to the reasons listed above the court in The Press also noted that "Press has commenced at least one other very similar securities class action in this District ... alleging violations of Section 10b-10 and 10b-5, and state common law in connection with the sharing of certain fees between introducing and clerking brokers without disclosure to, or consent of, investors. Press's complaint in that case was dismissed in its entirety." 988 F.Supp. at 384. It appears the court in *Press* may have been influenced by the plaintiff's unwarranted persistence in litigating meritless claims.

tinguishable from those in the instant case.[12] First, Cochran was not acting as an investment advisor to his client, but merely as a underwriter for the bond offering. *Id.* 109 F.3d at 662. Second, Cochran's client understood that underwriting the bond offering was a separate transaction from defendant's work brokering the guaranteed investment contract. *Id.* 109 F.3d at 666. Third, the bond offering had already closed before the defendant brokered the guaranteed investment contract. *Id.* Fourth, the plaintiffs did not rely upon the defendant to advise or evaluate the guaranteed investment contract. *Id.* Finally, the plaintiffs admitted that Mr. Cochran did not have a fiduciary duty with them during the second transaction of negotiating the guaranteed investment contract. *Id.* In the instant case, Plaintiff has alleged that Defendants recommended that the DOA issue bonds in order to buy securities, they helped the DOA in all aspects of their bond offering, and, finally, they sold the DOA, after locking out all competitors, the securities at an undisclosed markup.

Whether these were indeed two separate and distinct transactions, and whether Defendants had a fiduciary duty during the sale of the securities are both questions of fact that cannot be resolved in a motion to dismiss. Further, even if Defendants are correct in asserting that their fiduciary relationship did not extend to the sale of the securities, the existence of a fiduciary relationship during the bond offering may have required them to disclose the markup information to the DOA when they notified the DOA that they would be providing the securities. *See Rhoads*, 700 P.2d at 845 (holding "[w]here a relation of trust and confidence exists between two parties so that one of them places peculiar reliance in the trustworthiness of another, the latter is under a duty to make a full and truthful disclosure of all material facts and is liable for misrepresentation or concealment").

Finally, Defendants argue that the SEC and Municipal Securities Rulemaking Board ("MSRB") rules and regulations determine whether a duty to disclose existed. Defendants contend that under SEC and MSRB rules they had no statutory or regulatory duty to disclose information to the DOA regarding the markups. Defendants argue that they had no duty to disclose the markup under Rule 10b–10 because Rule 10b–10 does not apply to the sale of equity securities. (Rauscher Mot. at 14.) Defendants further contend that they had no duty to disclose the markup under MSRB Rule G–23, because Rule G–23 only imposes disclosure requirements on financial advisers when they purchase securities from their clients, not when they sell securities to their clients. *Id.* Defendants assert that in 1992, MSRB Rule G–23 did not even suggest that a financial adviser was required to make any specific disclosures when selling securities to an issuer. (Rauscher Reply at 10.) Defendants further contend that the absence of a full disclosure requirement in MSRB Rule G–23 can only be premised on the MSRB's view that no fiduciary relationship exists between a financial adviser and an issuer. *Id.* at 11. Defendants further assert that MSRB Rule G–23 establishes that an issuer and financial advisor may act as principals in relation to each other in transactions associated with an issuance so long as the financial adviser discloses its status as principal. *Id.*

Plaintiff does not contend that Defendants did not comply with these rules. Further, even if Defendants did comply fully with MSRB and SEC Rules, courts have held that "a broker-dealer's compliance with the disclosure requirements of Rule 10b–10 does not, *as a matter of law,* shield it from possible liability under Rule 10b–5." *Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 835 F.2d 1031, 1036 (3d Cir.1987) (emphasis added).

**C. Plaintiff's Omission Claim Based on Excessive Markups**

 Plaintiff asserts that Defendants had a duty to disclose the markups because the defendant also brokered a collateralized guaranteed investment contract. *Id.* The defendant received an undisclosed fee of $489,241.09 for his work in the second transaction. *Id.*

---

**12.** The defendant, Mr. Cochran, was the head of an underwriting firm that participated in a bond offering for the Oklahoma City Airport Trust Authority. *Cochran,* 109 F.3d at 662. In addition to acting as underwriter for the offering, the

markups were excessive. Plaintiff contends that the undisclosed markups charged by Defendants were excessive (1) in light of the circumstances surrounding the sale, and (2) because they were not reasonably related to prevailing market prices. (Compl.¶1.) Plaintiff alleges that Defendants had a duty to disclose the markups because the prices they charged were excessive in light of: (1) the existence of a fiduciary relationship; (2) the fact that Rauscher never considered or approached any other firm about providing the securities through competitive bid or negotiation; (3) the fact that Defendants assigned themselves the job of selling the securities despite an offer by the Office of the Treasurer of the State of Arizona to supply the securities; and (4) the fact that Defendants did not disclose, until after the deal had closed, that they would purchase the securities as principal for their own account. *Id.* ¶ 18. Plaintiff also alleges that Defendants had a duty to disclose the markups because they knew, or should have known, that the prices were excessive because they were not reasonably related to prevailing market prices. *Id.* Plaintiff alleges that Defendants made an undisclosed profit of $707,037 on the sale of their securities to the DOA. *Id.* Plaintiff further alleges that Defendants sold the DOA thirteen different securities with markups ranging from .0236% to .7333%, with the average markup for the entire deal being .55%. *Id.* ¶ 20. Finally, Plaintiff asserts that the average markup charged by dealers-brokers in sales of Treasury securities comparable to those at issue in the instant case range from zero to 2/32 (or .06%).[13] (Resp. at 28.)

Defendants, once again, contend that Plaintiff's complaint has not met the particularity requirements of Rule 9(b). Defendants contend that under the holding of *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) and *GlenFed,* 42 F.3d at 1549, Plaintiff must show how Defendants' actions were inconsistent with reasonable practices. Defendants would be correct if Plaintiff was asserting that a fraudulent statement about the markup had been made, Plaintiff, however, is asserting that Defendants made no statement

about the markup at all. In *Christidis* and *GlenFed,* the courts addressed statements made by banks in which they estimated loan loss reserves. In both cases, the plaintiffs were alleging that statements concerning loan loss reserves were fraudulent because they were different from later statements made by the bank that contained revised loan loss figures. *See Christidis,* 717 F.2d at 98; *GlenFed,* 42 F.3d at 1543. In *GlenFed,* the court held "both the valuation of assets and the setting of loan loss reserves are based on flexible accounting concepts ... plaintiff must set forth facts demonstrating why the difference between the earlier and the later statements is not merely the difference between two permissible judgements, but rather the result of falsehood." 42 F.3d at 1549. In *Christidis,* the court held that estimates of loan loss reserves "could be fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. What those practices were and how they were departed from is nowhere set forth." 717 F.2d at 99. Because Plaintiff is asserting an omission claim, those cases do not apply. Taking all these allegations as true, and drawing all inferences in favor of Plaintiff, Plaintiff has clearly met the requirements of Rule 9(b).

■■■ Plaintiff must first establish that Defendants had an affirmative duty to disclose the markup. There can be no question that broker-dealers have an obligation under federal securities laws to disclose markups that may be deemed excessive. *See SEC v. Feminella,* 947 F.Supp. 722, 729 (S.D.N.Y.1996). This duty arises because there is an implied representation by broker-dealers when they hang out their shingle to do business that they are charging their customers securities prices that are reasonably related to the prices charged in an open and competitive market. *See Charles Hughes & Co. v. SEC,* 139 F.2d 434, 437 (2d Cir.1943). Broker-dealers that do not disclose that they are charging excessive markups are committing

---

**13.** Plaintiff suggested leave to amend its Complaint to include this allegation. Plaintiff's request will be granted because the particularity will assist in moving the litigation forward.

fraud. *See SEC v. First Jersey*, 101 F.3d 1450, 1469 (2d Cir.1996). Thus, Defendants had a duty to disclose their markup only if it was excessive. Defendants contend that Plaintiff cannot establish a duty to disclose because the markup they charged was not excessive as a matter of law.

Plaintiff contends that the reasonableness of a markup can be determined only on the basis of the individual facts of each case. Plaintiff contends that case law has held that in order to determine whether a markup is excessive, a fact finder must assess all the relevant facts and circumstances of the transaction including: (1) the industry practice regarding the range of appropriate markups on a security in comparable transactions; (2) the availability of the security; (3) the total amount of money involved in the transaction; (4) the nature of the broker-dealer's business and the pattern of its markups; (5) the unit price of the security; (6) the nature of the services that the brokerage firm provides to the customer; and (7) the extent to which the broker-dealer was at risk in the transaction. *See Feminella*, 947 F.Supp. at 729. Plaintiff contends that because the determination of excessiveness depends so heavily on an extensive factual inquiry, it cannot be resolved on a motion to dismiss. In support, Plaintiff cites to *Feminella* where the court held:

> Given the fact-specific nature of the inquiry, it is clear that there is no single, fixed definition of what constitutes an excessive markup for all transactions. Rather, the fact finder must determine whether, under all the circumstances of the transaction, the price charged for the security was reasonably related to the prevailing market price. This determination cannot reasonably be made upon a motion to dismiss.

*Id.*

 The complex nature of a securities transaction generally makes it impossible in a motion to dismiss for a court to find that a markup is or is not excessive as a matter of law. This Court, however, rejects Plaintiff's position that excessiveness can never be de-termined in a motion to dismiss. As Defendants correctly point out in their motion, the SEC's position is contrary to the case law which has held that some markups are either so excessive, or so minimal, that they do not need to be heard by a fact-finder at trial. *See Press*, 988 F.Supp. at 385 (holding that as a matter of law that a markup of 1/6 of one percent was not excessive); *Grandon*, 147 F.3d 184, 192 (holding that "we anticipate that in some cases a trial court, as a matter of law, properly may conclude that a plaintiff has failed to state a claim that the markups were excessive"). While this Court agrees that it can determine whether markups are excessive as a matter of law, it is unable to rule that the markups charged by Defendants on these motions to dismiss were not excessive as a matter of law.

Defendants basically assert that a safe harbor exists in securities law that allows for markups of 5% or below. (Rauscher Mot. at 8.) Defendants contend that, in addition to the general 5% markup policy that the National Association of Securities Dealers (the "NASD") has created for debt securities, the SEC has also provided specific guidance for broker-dealers of zero-coupon bonds.[14] *Id.* at 9. Defendants contend that in the Zero–Coupon Release, the SEC recognized that the industry practice was to charge markups of up to 3.5%. *Id.* Defendants further contend that while the SEC recognized that markups of one percent could be excessive, the clear implication of the Release was that a markup of less than one percent on the purchase price was not excessive. *Id.* Defendants contend that because their average markup of .55% was at the low end of the range of markups allowed under the NASD's 5% policy and the guidelines for zero-coupon securities, their markups were not excessive as a matter of law.

Defendants assert that courts have recognized that the 5% policy and the guidelines in the Zero–Coupon Release clearly foreclose this Court from finding that the .55% markup they charged in this case is excessive. *Id.* at

---

14. Zero-coupon securities are debt securities that do not pay interest to the holder periodically prior to maturity. *Zero–Coupon Securities Release*, No. 34–24368, 1987 WL 133877, at *15576 (Apr. 29, 1987). The majority of the securities Defendants sold to the DOA were zero-coupon securities.

9–10. In support, Defendants rely heavily on the holding in *Press*. In *Press*, the plaintiff asserted that the defendant had charged an excessive undisclosed markup of 1/6 of one percent on a six-month Treasury bill in violation of Rule 10b–5. 988 F.Supp. at 385. In making its decision, the court relied heavily on the Zero–Coupon Release. *Id.* In reaching its decision that the markup was not excessive, the court stated that "[s]imply put, the markup is indisputably at the extreme low end of what the SEC considers to be acceptable.... More specifically, no authority of which this [c]ourt has been advised involves a markup even remotely as small as 1/6 of a percent markup at issue in this case." *Id.* 988 F.Supp. at 385–86. In the court's opinion " 'excessiveness' appears not to become a consideration in debt-security cases until markups reach the three to three and one-half percent range." *Id.* 988 F.Supp. at 386. Finally, Defendants contend that Plaintiff cannot, just as the plaintiff in *Press* could not, cite to any authority that has held that a markup under the 3.5% threshold set in the Zero–Coupon Release is excessive.[15] (Rauscher Mot. at 10.)

■ Defendants' argument is that the NASD and the SEC guidelines have produced a safe harbor, such that a court can rule, without taking into consideration the circumstances surrounding the deal, that a markup was not excessive simply because it fell below a certain percentage is not supported by the case law. While neither the SEC nor the MSRB has adopted a numerical standard for excessiveness, "the SEC has consistently held, that in sales of equities, undisclosed markups of more than 10% above the prevailing market price violate securities law." *Bank of Lexington*, 959 F.2d at 606. The Commission has also "consistently ... taken the position that mark-ups on debt securities ... generally are expected to be lower than mark-ups on equity securities." *Id.*; *see also SEC v. Charles A. Morris & Assoc., Inc.*, 386 F.Supp. 1327, 1334 (W.D.Tenn.1973). The NASD has taken the position that a markup on securities in excess of 5% is generally excessive. *See Lehl v. SEC*, 90 F.3d 1483, 1487 (10th Cir.1996). While the SEC and NASD have been willing to set a ceiling for markups, they have refused to set a floor, below which a markup can never be found excessive. The NASD has consistently stated, and courts have consistently held, that the five percent policy is not a rule, but merely a guideline. *See Samuel B. Franklin & Co. v. SEC*, 290 F.2d 719, 725 (9th Cir.1961); *Lehl*, 90 F.3d at 1487; *Bank of Lexington*, 959 F.2d at 613. In *Lehl*, the Court explained that:

> The NASD cautioned ... that the 5% policy 'is a guide—not a rule'; that a mark-up pattern of 5% or even less may be considered unfair or unreasonable; and that [i]n the case of certain low-priced securities, such as those selling below $10.00, a somewhat higher percentage may sometimes be justified.

90 F.3d at 1488 n. 4. In other words, excessiveness depends on the circumstances surrounding the deal as well as the percentage charged. For this reason, the SEC has held that markups below five percent can be excessive. *See In Re Investment Planning, Inc.*, 1993 WL 289728, at *2 (holding that markups on municipal bonds between 4 and 5.99% were excessive); and *In Re Lehman Bros., Inc.*, 1996 WL 519914, at *5 (holding that markups of 3.5 to 4.7% were excessive). The SEC's Zero–Coupon Release did not eliminate the need for a court to examine a markup in light of the circumstances surrounding a transaction; it merely lowered the ceiling for acceptable markups on debt securities.[16] 1987 WL 133877, at *15576.

---

**15.** In support of their position, Defendants cite to *Banca Cremi*, 132 F.3d at 1037 (holding that markups of 1.78% to 5.25% were not excessive); *Bank of Lexington*, 959 F.2d at 614 (holding that a 5.02% markup on zero-coupon bonds was not excessive); *In Re Investment Planning, Inc.*, 51 S.E.C. 592, 1993 WL 289728, at *2 (July 28, 1993)(holding that markups on municipal bonds between 4 and 5.99% were excessive); and *In Re Lehman Bros., Inc.*, 62 S.E.C. 2195, 1996 WL

519914, at *5 (Sept. 12, 1996)(holding that markups of 3.5 to 4.7% were excessive).

**16.** In 1988, the SEC issued its Zero–Coupon Release in which it recognized that "as a general matter, common industry practice regarding mark-ups is to charge a mark-up over the prevailing inter-dealer market price of between 1/32% and 3½% for conventional or 'straight'

While Defendants correctly note that the markups they charged were towards the low end of the range listed in the Zero Coupon Release, that fact alone does not mean that their markups were not excessive. The Zero Coupon Release simply indicates that the industry practice in 1992 was to charge markups from 3½ percent to 1/32 of one percent, depending on maturity, order size, and availability. *Id.* In other words, under some circumstances, markups as high as 3½% may not be excessive, but under other circumstances markups above 1/32 of one percent may be excessive. Defendants' argument that the Zero Coupon Release clearly implied that markups below one percent could not be excessive is not persuasive. The relevant portion of the Release states:

> [t]he commission has become aware of the practice of a number of broker-dealers of charging a percentage mark-up based on the face amount of a zero-coupon security for all maturities, a pricing practice often employed in the market for conventional coupon bonds. Although this percentage *may be as low as 1% of the face amount, such pricing can result in a mark-up that is excessive* relative to the prevailing market price because zero-coupon bonds trade at a deep discount.

*Id.* at \*15577 (emphasis added). There is no support in the Release for Defendants' argument that the SEC was setting one percent as a safe harbor. In fact, when the Release is read in its entirety, the exact opposite conclusion is reached. The SEC warned that a markup on zero-coupon bonds as low as one percent could be excessive because there was a practice among some brokers of charging a one percent markup. *Id.* There is simply no indication in the Release that the SEC was definitively stating that a markup below one percent could not also be excessive.

Defendants' argument that *Press* controls this case is also not persuasive. *Press* involved a one time transaction in which Mr. Press bought a "straight" U.S. Treasury bill

worth roughly $100,000 from Chemical Investment Securities. 988 F.Supp. at 378. The defendant charged a markup of 1/6 of 1% on the transaction. *Id.* The confirmation form sent by the defendant, the only contract between the parties, specifically stated that it was acting as principal. *Id.* Finally, the court found that "Press provide[d] no authority for his contention that 'the industry spread' for such a markup is five times less than what the defendants charged." *Id.* In the instant case, Plaintiff alleges that a fiduciary duty and other circumstances surrounding the deal exist to make the markup excessive. Further, the majority of the securities sold to the DOA were zero-coupon bonds, not "straight" treasuries. In the Zero–Coupon release, the SEC warned broker-dealers that markups as low as 1% could be excessive on zero coupon securities, but made no such warning for straight treasuries.[17] 1987 WL 133877, at \*15577. Finally, the SEC has alleged that the markups typically charged for the refunding transactions at issue here range from zero to 2/32 of one percent (.06%). (Resp. at 28.)

In none of the cases cited by Defendants did a court rule that the markup was not excessive simply because the percentage charged was under the 5% guideline, or the guidelines of the Zero–Coupon Release. In *Press*, the court recognized that "the determination as to whether a given markup is or is not excessive depends on a range of factors." *Id.* In *Banca Cremi*, the Fourth Circuit Court of Appeals rejected the fraud claim not because the markup was not excessive, but because "a disclosed markup would not have mattered." *Id.* 132 F.3d at 1037. Finally, in *Bank of Lexington*, the Sixth Circuit Court of Appeals upheld the district court's finding that the markups were not excessive because "the bank had failed to cite any evidence, besides the markup percentage, that Vining–Sparks had charged the bank an unfair price." 959 F.2d at 613.

Treasuries depending on maturity, order size, and availability." 1987 WL 133877, at \*15576.

17. In the Zero–Coupon Release, the SEC stated that "it is expected . . . that percentage mark-ups on zero-coupon securities, as with other debt

securities, usually will be smaller than those on equity securities." 1987 WL 133877, at \*15577. The SEC also stated that markups as low as one percent on zero-coupon bonds could be excessive because "they trade at a deep discount." *Id.*

Defendants are incorrect in stating that the SEC cannot cite to any authority that has held that a markup of less than 3½ percent may be excessive. The Commission held *In Re Lehman Brothers, Inc.,* 1996 WL 519914, at *6, that markups ranging from 3.5% to 4.7% were excessive. Significantly, the Commission further held that of the approximately $1,390,000 of markups that Lehman Brothers had charged on the $38.5 million securities sale, "at least $1 million" of that was excessive. *Id.* The markup the SEC considered appropriate under the circumstances of the case turns out to be approximately 1.01%. Defendants contend that markup was still twice the average markup they charged the DOA. The "at least" language, however, indicates that the SEC was only offering an estimate, and that the proper markup in the case could have been much lower than one percent. Further, even if Plaintiff could not cite to a case where a court found that a markup of less than 3.5% was excessive, that does not mean that Defendants' markup was not excessive.

While Defendants' arguments raise questions concerning Plaintiff's ultimate ability to prove its omissions claim, they do not persuade this Court to rule as a matter of law that Plaintiff cannot prove that the markups were excessive under the circumstances surrounding the transaction or because they were above the prevailing market price, or both.

Defendants contend that even if the markups were excessive, they did not have fair notice in 1992 that markups of less than one percent could be excessive. Defendants contend that as late as 1993, the SEC recognized that its markup decisions had failed to give notice to the industry that markups of less than five percent were excessive. Defendants cite to *In Re First Honolulu Securities, Inc.,* 51 S.E.C. 695, 1993 WL 380039, at *4 (Sept. 21, 1993), where the SEC held that "[u]nder all the circumstances before us here, however, it may not have been clear to [a]pplicants in 1990 that mark-ups on municipal securities of over four percent usually are unfair." Defendants further contend that in *Platsis v. E.F. Hutton & Co.,* 946 F.2d 38, 41

(6th Cir.1991) and *Banca Cremi,* 132 F.3d at 1037, courts have reached the same conclusion as the SEC in *First Honolulu,* that broker-dealers did not have notice that markups below five percent could be excessive.

Defendants contend that the lack of notice makes it impossible for Plaintiff to establish that Defendants acted with scienter.[18] In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." The Ninth Circuit Court of Appeals has held that in addition to knowing or intentional misconduct, recklessness may satisfy the element of scienter in a civil action for damages under Rule 10b–5. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir.1990). The Ninth Circuit has held that:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977), *cert denied,* 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)). Defendants contend that the most precise markup guidance available in June of 1992 was the SEC's Zero–Coupon Release and the NASD's 5% policy. (Rauscher Mot. at 12.) Defendants assert that because no guidance in 1992 even suggested that a markup of less than 1 percent could be fraudulent, their markups of .0266 to .73 of one percent could not have been excessive. Defendants contend that if they had no notice that their markups were excessive, then under no circumstance could their actions have been an extreme departure from the prevailing standards necessary to find scienter. Defendants also assert that the retroactive application of a new standard violates due process. Defendants contend that even if the SEC now considers markups in

18. *See supra* note 7.

excess of .06 of one percent to be excessive, no one in the industry was on notice in 1992 that such standards would be applied rather than those in the Zero–Coupon Release. (Rauscher Reply at 7.)

Once again, Defendants' arguments raise questions of fact. At trial, or the summary judgement stage, Defendants may be able to argue that there was no industry practice of charging less than a one percent markup, that the industry had no notice that markups of less than one percent could be excessive, and that they did not have the necessary mental state to satisfy the scienter requirement; but, in this motion, those arguments are not well-taken. The cases cited by Defendants do no more than raise material issues of fact, they do not settle the issue. Plaintiff alleges that the industry practice was to charge between zero and 2/32 of one percent markup on transactions comparable to those at issue in this case. (Resp. at 28.) Plaintiff further alleges that the markups changed by Defendants ranged from .02 of one percent to .77 of one percent. (Compl. ¶ 20.) These allegations, taken as true, could potentially allow a reasonable trier of fact to find that scienter existed.

Defendants' due process claim must also fail because Plaintiff asserts that in 1992 the industry standard was to charge between zero and 2/32 of one percent for transactions like the one in question. (Resp. at 28.) A new standard is not being applied retroactively; Plaintiff is asserting that the same standard has existed all along. If this standard did exist as Plaintiff alleges, then people within the industry obviously knew that the SEC could sue those broker-dealers who charged in excess of that standard, even if the SEC was not actively pursuing claims against those broker-dealers in 1992.

Finally, Defendants' argument that its markup practice was in line with industry practices, and therefore, it could not have violated the law was rejected by the court in *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 273–74 (3d Cir.1998). In that case, the Third Circuit Court of Appeals held:

> In concluding as we do, we are not unmindful of the fact, deemed determinative by the district court, that execution of customer orders at the NBBO was a practice 'widely, if not almost universally followed' in the securities industry .... Under the district court's logic, a Section 10(b) defendant would be entitled to summary judgement even if it were her regular practice to knowingly violate the duty of best execution, so long as she could identify a sufficient number of other broker-dealers engaged in the same wrongful conduct to be able to argue in good faith that the underlying duty was 'ambiguous.' We cannot accept an analysis that would produce such a result. Even a universal industry practice may still be fraudulent.

*Id.* Accordingly, this Court finds that Plaintiff has met its burden under Rule 12 for its omission claim based on excessive markups.

**D. Plaintiff's Claims Under the Investment Advisers Act of 1940**

Plaintiff has alleged in all three of its claims that in addition to violating the Securities Act of 1933 and the Securities Exchange Act of 1934, Defendants also violated the Investment Advisers Act of 1940 ("the Act"), 15 U.S.C. § 80b–6. Defendants contend that all three of Plaintiff's claims brought under the Act fail to state a claim that is actionable under the Act.

Defendants contend that the only basis for Plaintiff's allegations is the fact that Defendants are registered as investment advisers under the Act. (Rauscher Mot. at 28.) Defendants assert that registration as an investment adviser does not alone bring all of a broker-dealer's actions within the scope of the Act. *Id.* Accordingly, Defendants contend that the Act does not apply to the transactions at issue in this case for several reasons. First, Defendants assert that the Act's definition of an investment adviser specifically excludes those who provide advice with respect to debt obligations of, or guaranteed by, the United States. *Id.* Defendants argue that because the Complaint alleges that the securities they provided to the DOA were Treasury securities of the United States, they are not a financial adviser under the Act. *Id.* Second, Defendants contend that Plaintiff's allegation that they acted as an

investment adviser in the sale of the securities is contrary to the other allegations in the Complaint, the terms of the contract, and the information contained in the confirmation forms. Defendants argue that these documents establish that Defendants were acting as a broker-dealer. Third, Defendants assert that even if the statutory exclusion did not apply, there is no authority for the proposition that a financial consultant who assists in the structuring and issuance of municipal bonds is subject to the Act. *Id.* Defendants further contend that in *Dominion Resources, Inc.,* SEC No–Action Letter, 1985 WL 54428, at *6 (Aug. 24, 1985) and *The Knight Group,* SEC No–Action Letter, 1991 WL 251302, at *2–3 (Nov. 13, 1991), the SEC held that firms that provide ancillary investment advice to state and local governments in the course of providing assistance in the issuance of bonds are not subject to the requirements of the Act. *Id.* Defendants assert that any advice they gave concerning a forward supply contract, or a guaranteed investment contract (GIC), or both, was ancillary advice regarding the "investment of temporarily idle proceeds of an issue" and, as such, is not "investment advice" subject to the Act. *See The Knight Group,* 1991 WL 251302, at *2–*3. Finally, Defendants assert that a prerequisite of the Act is that there must be a charge for the investment advice, and in this case Defendants did not charge or receive compensation for their advice. (Rauscher Mot. at 29–30.)

Defendants' allegation that the only basis for Plaintiff's claims is the fact that Defendants are registered as investment advisers under the Act is incorrect. Plaintiff alleges that Defendants acted as an investment adviser, within the meaning of the Act, because in connection with the 1992B COPs offering, Defendants received a fee for their advice to the DOA concerning the availability of investing in, purchasing, or selling securities. (Compl.¶ 23.) Plaintiff alleges that in addition to selling the escrow securities to the DOA, Defendants advised the DOA to structure the defeasance escrow to include a forward supply contract. *Id.* Plaintiff also alleges that Defendants received a separate fee for acting as co-broker in the procurement and sale of a GIC. *Id.* Plaintiff has demonstrated in its allegations that it has relied upon more than the mere fact that Defendants are a registered financial adviser to assert their claims under the Act.

█ Defendants, however, are correct in stating that registration as an investment adviser under the Act does not alone bring all of a broker-dealer's actions within the scope of the Act. In order to face liability under the Act, a defendant must first meet the Act's definition of an investment adviser. The Act defines an investment adviser as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities ....

15 U.S.C. § 80b–2(a)(11). Plaintiff has alleged that Defendants, for compensation, advised them as to the advisability of investing in United States Treasury securities, a forward supply contract, and a GIC. (Compl.¶ 23.) Plaintiff has alleged enough facts to support its allegation that Defendants are an investment adviser under the Act. The only remaining question is whether Defendants meet one of the exclusions to this definition that has been created by SEC regulations or the Act itself.

Defendants are correct when they state that the Act's definition of investment adviser excludes those who provide advice with respect to debt obligations of the United States. The Act states that the definition of investment adviser excludes "any person whose advice, analyses, or reports relate to no securities other than securities which are direct obligations of or obligations guaranteed as to principal or interest by the United States, or securities issued or guaranteed by corporations in which the United States has a direct of indirect interest ...." 15 U.S.C. § 80b–2(a)(11)(E). The SEC, however, has consistently stated ·that this exception does not apply when an individual, in addition to providing advice on United States securities, gives advise on any other security that is not

a United States' security. In *J.Y. Bery Arbitrage Mgmt.,Inc*, SEC No–Action Letter, 1989 WL 246531, at *3 (Oct. 18, 1989), the SEC stated "[y]ou should note that if you provide advice as to any security other than a government security as provided in Section 202(a)(11)(E), you may not rely on this exception." *See also Securities Counselors of Iowa, Inc.*, SEC No–Action Letter, 1989 WL 246135, at *5 (June 29, 1989). In this case, Plaintiff has alleged that in addition to advising the DOA to buy United States Treasuries, Defendants also advised them to invest in a forward supply contract and a GIC. (Compl.¶ 23.) Both the forward supply contract and the GIC are separate debt securities, and neither was issued or insured by the United States. Accordingly, Defendants do not come under the government securities exception.

Defendants' argument that it was clear from the contract and the confirmation forms that they were acting as a broker-dealer, and not a financial adviser, in the sale of the securities has already been found unpersuasive. Even assuming that Defendants were acting as a broker-dealer in the sale, the Act only excludes broker-dealers from the definition of an investment adviser when the "performance of such services (financial advising) is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b–2(a)(11)(C). Plaintiff has alleged that Defendants' advice was not incidental to, but central to the 1992B COPs offering. (Compl.¶ 14.) Plaintiff alleges that Defendants' advice included recommending which securities should comprise the escrow, that the escrow include a supply contract, what price the DOA should pay for the escrow securities, the amount of money the DOA should accept for the forward supply contract, and whether the reserve fund should be invested in a GIC. Even assuming that Defendants were acting as broker-dealer, the broker-dealer exclusion is inapplicable because based on these allegations, this Court cannot find that advice given was "solely incidental" to Defendants' broker-dealer business.

Defendants' argument that *The Knight Group* and *Dominion Resources, Inc.* No–Action Letters control this case is unpersuasive. Defendants seem to assert that these letters have established that a financial consultant who advises on municipal issues is never subject to the Act. This interpretation of the letters is unpersuasive. Neither letter states that financial advisers that provide advice to municipal issues are exempt from the Act. The *Dominion Resources, Inc.* letter comes the closest to supporting Defendants' position and it merely states that "[t]he division of Investment Management ("IM") has asked us to inform you that, in general, IM does not interpret Section 202(a)(11) of the Investment Advisers Act of 1940 to apply to persons that advise issuers on how to structure their financing." 1985 WL 54428, at *6. The "in general" language clearly indicates that there is no rule that municipal finance advisers do not meet the definition of financial adviser under the Act. The letters simply held that the SEC would not take action against individuals that gave investment advice at the request of the issuer concerning idle proceeds from the offering. *See The Knight Group*, 1991 WL 251302, at *2 (stating that the SEC stated they would not seek action against the Knight Group if the advice was "requested by the issuer" and limited to "recommendations about investment of temporarily idle proceeds of an issuer pending their project use"); *Dominion Resources, Inc.*, 1985 WL 54428, at *6 (stating that the SEC stated they would not take action against Dominion if they advised "without compensation and as an accommodation to the issued" and only made "recommendations about the investment of temporarily idle proceeds of an issue"). Defendants contend that any advice they gave concerning a forward supply contract, or a GIC, or both, concerning idle proceeds is contrary to the facts alleged by Plaintiff. As Plaintiff correctly points out, the whole purpose of issuing 1992B COPs was to raise proceeds which were sufficient, if properly invested, to defease the 1988 COPs and achieve savings for the State. Defendants' role was to insure that the proceeds of the offering were, in fact, properly invested. Plaintiff has alleged that Defendants recommended the various

securities investments. Plaintiff has also alleged that Defendants charged a fee for their advice. Finally, Plaintiff has alleged that there were no idle proceeds to give advice on because the plan from the beginning was to invest the proceeds from the offering in United States Treasury securities, a GIC, and a forward supply contract. Based on the facts alleged by Plaintiff, Defendants cannot rely on *The Knight Group* and *Dominion Resources, Inc.*, No–Action letters.

Finally, Defendants' allegation that they received no compensation for their advice is contrary to the facts alleged in the Complaint. Plaintiff alleges that Defendants received $71,840 as a financial advisory fee, over $700,000 for selling the escrow securities, and additional and separate compensation for its work in the procurement and sale of the GIC. (Compl.¶¶ 13, 22, 23.) While some of Defendants' arguments appear to raise questions of fact, they do not prove Plaintiff cannot, as a matter of law, prove its claims under the Act.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for leave to amend its Complaint to include allegations concerning the industry standard of markups is granted. Plaintiff has thirty days to file an Amended Complaint.

**IT IS FURTHER ORDERED** that Defendant James R. Feltham's Motion to Dismiss (Doc. # 9) is denied.

**IT IS FURTHER ORDERED** that Defendants Rauscher Pierce Refsnes, Inc.'s and Dain Rauscher Inc.'s Motion to Dismiss (Doc. # 11) is denied.